**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re:                                                                  Chapter 15

    Sunac China Holdings Limited,                        Case No. 23-11505 (PB)

           Debtor in Foreign Proceeding.

------------------------------------------------------------------x

**MODIFIED BENCH RULING GRANTING DEBTOR'S MOTION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

<u>**APPEARANCES:**</u>

SIDLEY AUSTIN LLP
*Counsel for the Debtor*
787 Seventh Avenue
New York, New York 10019
<u>By</u>: Anthony Grossi

<u>**Hon. Philip Bentley**</u>
<u>**U.S. Bankruptcy Judge**</u>

1

## Table of Contents

**INTRODUCTION** ................................................................................................ **3**

**FACTUAL BACKGROUND** ............................................................................... **5**

   I.   THE DEBTOR AND THE SUNAC GROUP ......................................................... 6
   II.  THE DEBTOR'S RESTRUCTURING ............................................................... 7

**DISCUSSION** ..................................................................................................... **10**

   I.   THE LEGAL STANDARD FOR DETERMINING A DEBTOR'S COMI ..................... 10
   II.  THE DEBTOR'S COMI IS IN HONG KONG ................................................... 13
        A.   *The SPhinX Factors Are Inconclusive* ................................................ *16*
           1.   The location of the Debtor's headquarters ................................. 16
           2.   The location of those who actually manage the Debtor ............. 17
           3.   The location of the Debtor's primary assets ............................. 18
           4.   The location of the majority of the Debtor's creditors ............. 20
           5.   The jurisdiction whose law would apply to most disputes ....... 20
        B.   *The Debtor's Business Activities Were Regularly Carried Out and Approved in Hong Kong* ....................................................................................................... *21*
        C.   *Creditor Expectations Further Support a Hong Kong COMI* ..................... *23*
        D.   *Creditors' Overwhelming Approval of the Scheme, Coupled With the Absence of Objections, Provides Further Support for a Hong Kong COMI* ......................... *25*

**CONCLUSION** ................................................................................................. **27**

## INTRODUCTION[1]

This case raises the question of when, under chapter 15 of the Bankruptcy Code, a bankruptcy court may recognize and enforce a scheme of arrangement sanctioned by a Hong Kong court for a Hong Kong-listed holding company whose principal activity is to finance the operation of subsidiaries located on mainland China.

The debtor, Sunac China Holdings Limited (the "Debtor"), is the parent company of a corporate group (the "Sunac Group" or "Group") that operates one of the largest property development businesses in the People's Republic of China (the "PRC"). A pure holding company, the Debtor itself has no material operations, and few assets other than the stock of and amounts owed by its subsidiaries. Although the Debtor is listed on the Hong Kong Stock Exchange and claims to be headquartered in Hong Kong, it has no physical presence there beyond a "mail-drop" address. Almost all of the Debtor's senior management—all but its chief financial officer—live and work on mainland China, where the Sunac Group maintains multiple executive offices.

Last year, the Debtor filed a judicial proceeding in Hong Kong to restructure its debt through a scheme of arrangement, which the Hong Kong court approved. The Debtor then filed this chapter 15 case and moved for recognition of the Hong Kong proceeding as a "foreign main proceeding" under Bankruptcy Code § 1517. Recognition requires a finding that the Debtor's "center of main interests"—its "COMI," to use the well-known abbreviation—is in Hong Kong, rather than on mainland China or in the Cayman Islands, where the Debtor is incorporated.[2]

---

[1] On November 17, 2023, the Court read into the record its bench ruling and entered an order granting the Debtor's motion for recognition and related relief. This decision memorializes and expands upon, and in limited respects modifies, the reasons the Court gave in its bench ruling for finding that the Debtor's COMI is in Hong Kong.

[2] Hong Kong is a Special Administrative Region of the PRC, which in most respects has retained a high degree of autonomy from the mainland during the 27 years since the United Kingdom's handover of Hong Kong to the PRC in 1997. Since that time, Hong Kong has had its own constitution, known as the Basic Law, which governs Hong Kong's separate political, economic and legal systems. *See* Department of Justice, Government of the Hong Kong Special

Notwithstanding the Debtor's limited physical presence in Hong Kong, the Court finds its COMI is located there, because Hong Kong is and has always been the primary locus of the Debtor's business activities and decision-making. As a holding company, the Debtor's main business activity has been to issue debt in international capital markets and, in recent years, to restructure that debt. It has carried out these activities principally in Hong Kong, where its CFO and outside advisors are based, and where its board of directors has held most of its in-person meetings.

These facts are sufficient both to overcome the statutory presumption that the Debtor's COMI is in the Cayman Islands and to establish that Hong Kong is the Debtor's COMI. The Court bases this conclusion partly on an application of the factors identified by Judge Drain in his seminal decision, *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y.2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007). Ultimately, however, the Court has been guided primarily by the core COMI principle emphasized by the Second Circuit in *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127 (2d Cir. 2013) ("*Fairfield Sentry*"): "COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties." *Id.* at 130, 138. This principle warrants a Hong Kong COMI finding here. Creditor expectations, and creditors' overwhelming approval of the Debtor's Hong Kong restructuring, further support this conclusion.

---

Administrative Region, *Our Legal System* (Nov. 30, 2023), available at https://www.doj.gov.hk/en/our_legal_system/basic_law.html [https://perma.cc/KD7R-ZWNK].

Throughout this decision, when referring either to geographic locations or to legal regimes, the Court uses the terms "mainland China" and "PRC" to refer to China exclusive of its two Special Administrative Regions, Hong Kong and Macau.

For these reasons, the Court grants the Debtor's motion for recognition of the Hong Kong proceeding as a foreign main proceeding, and for enforcement of the Hong Kong scheme of arrangement and related relief.[3]

### FACTUAL BACKGROUND

The Debtor commenced this case by filing its petition for recognition of a foreign proceeding under chapter 15 of the Bankruptcy Code on September 19, 2023. The same day, the Debtor's foreign representative, Gao Xi, filed the present motion (the "Motion"), which seeks recognition of the Hong Kong proceeding as a foreign main proceeding, or alternatively a foreign nonmain proceeding, under Code § 1517; recognition of Mr. Gao as the Debtor's foreign representative; enforcement of the scheme of arrangement (the "Scheme") sanctioned by the Hong Kong court; and related relief under chapter 15. The Debtor initially filed two declarations in support of the Motion—one by Mr. Gao, and another by the Debtor's Hong Kong counsel, Ang Chee Khian Desmond. The Debtor subsequently filed a supplemental declaration by Mr. Ang describing the Hong Kong court's October 5, 2023 order sanctioning the Scheme.

No objections to the Motion were filed. On October 31, 2023, the Court held a hearing on the Motion, at which Mr. Gao testified. At the hearing, the Court expressed concern that Mr. Gao's testimony raised questions as to whether the locus of the Debtor's decision-making was on

---

[3] Given the Court's recognition of the Hong Kong proceeding as a foreign main proceeding, the Court does not rule on the Debtor's alternate request for recognition as a foreign nonmain proceeding. Nor does this opinion address the other issues raised by the Debtor's motion, which are uncontroversial and which the Court addressed in its bench ruling. These include (i) whether the Debtor meets the eligibility requirements under Code § 109(a); (ii) whether venue in this Court is proper under 28 U.S.C. § 1410(1); (iii) whether Mr. Gao is entitled to recognition as a duly appointed "foreign representative" as defined in Code § 101(24); (iv) whether the Hong Kong proceeding is a foreign proceeding as defined in Code § 101(23); (v) whether this case was properly commenced pursuant to Code §§ 1504, 1509 and 1515; (vi) whether the petition meets the requirements of Code § 1515; (vii) whether the Debtor is entitled to nondiscretionary relief pursuant to Code § 1520(a); (viii) whether the Debtor is entitled to discretionary relief pursuant to Code §§ 1521(a) and 1507; (ix) whether the interests of creditors and other interested parties are sufficiently protected, as required by Code § 1522(a); and (x) whether any of the requested relief is manifestly contrary to the public policy of the United States, as prohibited by Code § 1506.

mainland China, rather than in Hong Kong. At the Court's suggestion, the Debtor then presented additional evidence addressing this issue—namely, the declaration of Cheng Chung Hon, another of the Debtor's Hong Kong counsel, followed by Mr. Cheng's live testimony at the continued hearing on the Motion held on November 15, 2023. On November 17, the Court read into the record its bench ruling granting the Motion and entered an order to the same effect.

The factual findings below are taken from the declarations and exhibits filed by the Debtor in support of the Motion, the live testimony given by Messrs. Gao and Cheng at the October 31 and November 15 hearings, and the Debtor's offering memoranda and other public filings.

## I.      The Debtor and the Sunac Group

The Debtor is a holding company for a group of subsidiaries that operate in mainland China and that are principally engaged in the property development and property investment business. The Group operates one of the largest property companies in the PRC, with assets of approximately US$150 billion and debts of US$138 billion as of December 31, 2022. The Group's assets consist principally of real estate located in mainland China, including properties under development valued at approximately US$85.1 billion and completed properties valued at approximately US$7.8 billion. The Group's borrowings consist principally of "onshore" debt—that is, Remnimbi-denominated debt raised in China's domestic capital markets. The Group also has a smaller amount of "offshore" debt—that is, dollar-denominated debt raised in the international credit markets. All of the onshore debt was borrowed by the Debtor's subsidiaries, and all of the offshore debt was borrowed by the Debtor. The Debtor is not liable for the onshore debt. A small number of the Debtor's subsidiaries have guaranteed the offshore debt.

The Debtor itself has no material operations. Historically, the Debtor's principal business activity was to raise offshore debt. Its other main business activities were to hold the equity of its subsidiaries, to maintain the listing of its stock on the Hong Kong Stock Exchange, and to manage

certain investments (principally a few swap and option agreements). The Debtor maintains a small amount of cash in its Hong Kong bank accounts to fund its activities. Its assets consist principally of its investments in its subsidiaries and amounts due from its subsidiaries, totaling US$3.5 billion and US$8.3 billion, respectively, as of December 31, 2022. The Debtor's liabilities consist principally of the US$9.04 billion of offshore debt that it is restructuring pursuant to the Scheme, which it refers to as the "Existing Debt."

The Debtor has been incorporated in the Cayman Islands as an exempted company with limited liability since 2007. It has been registered to do business as a non-Hong Kong company under Hong Kong's Companies Ordinance since 2009, and its shares have been listed on the Hong Kong Stock Exchange since 2010. As a result of its stock exchange listing, the Debtor has been required to publish financial statements with the stock exchange and to submit to oversight and regulation by the Hong Kong Securities and Futures Commission. The Debtor is not registered to do business in the PRC, does not have any business licenses there, and does not file tax returns there.

Most of the Debtor's subsidiaries are organized under the laws of the PRC. A minority of the Debtor's subsidiaries, including all of the subsidiaries that guaranteed the offshore debt raised by the Debtor, are incorporated in the British Virgin Islands or in Hong Kong.

## II.    The Debtor's Restructuring

In late 2021, China's real estate market encountered a number of well-publicized setbacks, including reduced lending for property buyers seeking mortgage financing and a government-imposed debt limit for developers. These developments, together with the continuing impact of COVID-19 on the market, caused a liquidity crunch for Chinese property development companies, including the Sunac Group. Faced with a decline in sales coupled with reduced access to external capital, the Group defaulted on a substantial portion of its debts, including all of the Existing Debt.

In June 2022, the Group began negotiations to restructure both its onshore and its offshore debt. These efforts resulted in agreements to amend and extend, or to obtain forbearance with respect to, the Group's public and private onshore bonds. The Debtor was able to reach similar agreements for certain of its offshore private debts, but not for the remainder of its borrowings. Those remaining borrowings—the Existing Debt—consist of approximately (i) $7.93 billion of senior notes, all of which is governed by New York law, and (ii) $1.12 billion in private debt, of which $29 million is governed by U.K. law and the balance (about $1.1 billion) is governed by Hong Kong law. All of the Existing Debt is unsecured, and all of it is in default as a result of either failure to pay principal at maturity, failure to pay interest when due, or the triggering of cross-default clauses.

To restructure the Existing Debt, the Debtor negotiated a restructuring support agreement, initially executed in March 2023 (as subsequently amended, the "RSA"), with creditors holding more than 85% of the outstanding principal amount of that debt, under which the parties agreed to support and implement the Scheme. Under Hong Kong law, a scheme of arrangement allows a company and its creditors to obtain court approval for restructuring measures without obtaining approval from 100% of the affected creditors. After notice and an initial hearing convening the debtor's creditors, the Hong Kong court may approve, or "sanction," a scheme if a majority of creditors in number, representing at least 75% in value, vote to approve the scheme at a meeting scheduled with the court. After the vote, the Hong Kong court conducts a second hearing and, based on a review of the voting procedures and the fairness of the scheme's terms, decides whether to sanction the scheme.

While the details of the Scheme are complex, its basic structure is simple. All debt subject to the Scheme—that is, the approximately US$9 billion principal amount of Existing Debt—will

be exchanged for a combination of new notes and convertible bonds, with extended maturity and repayment schedules, as well as some equity. The Debtor estimates that Scheme creditors will receive a recovery of close to 100%, compared to the less-than-10% recovery they would receive in a liquidation.

The Debtor commenced its Hong Kong restructuring proceeding in March 2023, by filing a summons with the Court of First Instance of the High Court of the Hong Kong Special Administrative Region (the "Hong Kong Court"). A convening hearing was held in July and notice of the Scheme was provided in August. No objections to the Scheme were filed. At the September 18 scheme meeting, creditors voted overwhelmingly to approve the Scheme, with 99.75% in number, and 98.3% in value, of creditors present voting in favor.

The Debtor filed this case under chapter 15 of the Bankruptcy Code the next day, on September 19, 2023. By order dated October 5, 2023, the Hong Kong Court sanctioned the Scheme. Subsequently, on November 6, the Hong Kong Court issued its opinion explaining its basis for sanctioning the Scheme. The court found that the Scheme "is a legitimate debt restructuring scheme which has complied with all the statutory requirements and has received the requisite Scheme Creditors' overwhelming support." *Re Sunac China Holdings Limited*, [2023] HKCFI 2850 at ¶ 39 [https://perma.cc/4FVQ-JD8C]. In addition, the court found, the Scheme has a sufficient connection to Hong Kong, and it is likely to be effective in other relevant jurisdictions, including the United States, *id.* at ¶¶ 31-37—a particularly important consideration, since most of the Scheme debt is governed by New York law and subject to the non-exclusive jurisdiction of the New York courts.

**DISCUSSION**

Although no-one has objected to the Motion, this Court has independently reviewed the Debtor's request for recognition and, in particular, the determination of the Debtor's COMI. As several bankruptcy courts in this District have held, a court should not rubber-stamp a debtor's request for recognition, but instead should make its own COMI determination even if there are no objections. *See In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 782 (Bankr. S.D.N.Y. 2022); *In re Basis-Yield Alpha Fund (Master)*, 381 B.R. 37, 51–54 (Bankr. S.D.N.Y. 2008); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008). At the same time, the court may consider the absence of objections to recognition, along with the extent of creditor approval of the foreign restructuring, as pertinent factors in making its COMI determination. *See Modern Land*, 641 B.R. at 789-90; *In re SPhinX, Ltd.*, 351 B.R. at 117.

**I.       The Legal Standard For Determining a Debtor's COMI**

Chapter 15 of the Bankruptcy Code authorizes a bankruptcy court to recognize and enforce a foreign insolvency proceeding if certain requirements are met. A key threshold requirement is a finding that the foreign proceeding is a "foreign main proceeding" (in which case U.S. proceedings against the debtor are automatically stayed) or, alternatively, a "foreign nonmain" proceeding (in which case the court has discretion to impose the stay). Code § 1517(a)(1); *see also id.* § 1520 (effects of recognition of foreign main proceeding); *id.* § 1521 (additional relief that may be granted upon recognition of foreign main or nonmain proceeding). The Debtor here requests a determination that the Hong Kong proceeding is both a foreign main and a foreign nonmain proceeding. Given the Court's finding that the Hong Kong proceeding is a foreign main proceeding, the Court need not and does not reach the latter issue.

10

Section 1502(4) defines a foreign main proceeding as "a foreign proceeding pending in the country where the debtor has the center of its main interests." Code § 1502(4). The Bankruptcy Code does not define the term "center of main interests," but section 1516(c) does create a rebuttable presumption: "In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." Code § 1516(c). According to the House Report that accompanied the passage of chapter 15, "'[r]egistered office' is the term used in the Model Law to refer to the place of incorporation or the equivalent for an entity that is not a natural person." *See* H.R. Rep. No. 109-31, at 112-13 (2005) ("House Report") (citing Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency [the "UNCITRAL Guide"] at 36, Art. 16(3) [https://perma.cc/2W3L-LPHT]); *see generally* 8 COLLIER ON BANKRUPTCY ¶ 1516.03 (16th ed. 2023). The House Report adds, "[t]he presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy." H.R. Rep. No. 109-31, at 112-113.

Although the Bankruptcy Code does not define COMI or give any express guidance as to how the statutory presumption can be rebutted, two Bankruptcy Code sections give indirect guidance, as does the House Report:

- Code § 1501(a) provides an express statement—unique to the Bankruptcy Code—of chapter 15's purpose and objectives: "The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency" adopted by the United Nations Commission on International Trade Law ("UNCITRAL"), with the objectives of cooperation between U.S. and foreign courts, greater legal certainty, fair and efficient administration, protection and maximization of the debtor's assets, and the rescue of financially troubled businesses.

- Code § 1508 adds, "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."

- In addition, the House Report states that, "for guidance as to the meaning and purpose of [the Model Law's] provisions," courts should look to the UNCITRAL Guide. *See* House Report at 106 n. 101 (2005).

As the Second Circuit observed in *Fairfield Sentry*, the House Report's reference to the

UNCITRAL Guide is important:

> The UNCITRAL Guide . . . does not itself define COMI, [but it] indicates that the concept was drawn from the European Union Convention on Insolvency Proceedings. . . . In turn, the European Union Council Regulation [the "EU Regulation"] enacting the Convention on Insolvency Proceedings provides some guidance: "The 'centre of main interests' should correspond to the place where the debtor *conducts the administration of his interests on a regular basis* and *is therefore ascertainable by third parties*."

*Fairfield Sentry*, 714 F.3d at 136 (quoting Council Regulation (EC) No 1346/2000 of 29 May

2000, Preamble ¶ 13) (emphases added by Second Circuit). This principle, the court of appeals

held, should underpin a court's COMI determination:

> The relevant principle (for which we consult foreign law, as directed by the statute) is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties.

*Id.* at 130; *see also id.* at 138 ("While this guidance [by the EU Regulation] may have been of

limited utility in resolving the timing question [*i.e.*, the time at which COMI should be determined]

. . ., it underscores the importance of factors that indicate regularity and ascertainability.").

Beyond identifying this baseline principle, the Second Circuit's *Fairfield Sentry* decision

addresses the standards governing two aspects of a court's COMI determination: the time at which

COMI should be determined, and the factors a court may consider to determine whether the

registered-office presumption has been overcome. On the first of these issues, the Second Circuit

held that "a debtor's COMI is determined as of the time of the filing of the Chapter 15 petition."

714 F.3d at 133. However, "[t]o offset a debtor's ability to manipulate its COMI, a court may also

look at the time period between the initiation of the foreign liquidation proceeding and the filing

of the Chapter 15 petition." *Id.; see also id.* at 137 ("given the EU Regulation and other

international interpretations, which focus on the regularity and ascertainability of a debtor's COMI, a court may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith.").

As for the factors to be considered, the court of appeals emphasized that bankruptcy courts have broad discretion, given the absence of a statutory definition for the term COMI: "The absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation." *Id.* at 138. Relevant factors include those identified by Judge Drain in *SPhinX*:

> Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* at 137 (quoting *SPhinX*, 351 B.R. at 117). At the same time, while "[t]his nonexclusive list is a helpful guide, . . . consideration of these specific factors is neither required nor dispositive." *Id.* Another factor the court may consider is the location of "a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled." *Id.* at 138 n. 10 (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010)).

## II.   The Debtor's COMI is in Hong Kong

Applying these legal standards, the starting point is that the Debtor is incorporated under Cayman Islands law, creating a rebuttable presumption that its COMI is located there. Code § 1516(c). This presumption is bolstered by the fact that the Debtor's offering memoranda advised investors that, because of its Cayman Islands incorporation, any eventual insolvency proceeding would likely be governed by Cayman Islands law. *See, e.g.*, Offering Memorandum, Sunac China

Holdings Limited (Jan. 21, 2021) at 49 [https://perma.cc/6UTH-83B6]. Thus, to the extent creditors had expectations as to where an eventual restructuring proceeding might be filed, the Cayman Islands was presumably at or near the top of the list—a factor that can be entitled to substantial weight. *See Modern Land*, 641 B.R. at 786-93 (finding that COMI of holding company debtor was in Cayman Islands where debtor was incorporated there, offering memoranda said insolvency proceedings would likely involve Cayman Islands insolvency law, debtor filed its restructuring in the Caymans, and creditors overwhelmingly supported that restructuring).

However, the Debtor appears to have no other Cayman Islands connections. As far as can be told from the record, the Debtor conducts no business in the Caymans, has no assets or creditors there, and has no offices there except a "mail-drop" address. In addition, the Debtor chose not to restructure in the Cayman Islands—a potentially dispositive consideration in this circuit, given *Fairfield Sentry*'s holding as to the time period governing COMI determinations.[4] Collectively,

---

[4] Had the Debtor chosen to restructure in the Cayman Islands, instead of in Hong Kong, it might have a strong argument that, under *Fairfield Sentry,* this would have shifted its COMI to the Cayman Islands. So long as the Debtor conducted its restructuring activities in the Caymans for a sufficient length of time before filing its restructuring case, it could claim that made the Caymans the locus of its main business activities by the operative time period, namely, "the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition," *Fairfield Sentry,* 714 F.3d at 137.

The prospect of last-minute COMI shifts of this sort—allowing a debtor (particularly a holdco or liquidating debtor that has few business activities other than its restructuring or liquidation) to transfer its COMI to a jurisdiction with which it had few prior connections, simply by choosing to restructure there—has been sharply criticized by some commentators. For example, Professor Jay Westbrook, a leading international insolvency scholar, has characterized *Fairfield Sentry*'s limited look-back rule as "about the same as saying that the place of a tort claim for choice-of-law purposes is the court where the negligence suit has been brought." Jay L. Westbrook, *Chapter 15 Comes of Age*, 129 ANN. REV. OF INSOLVENCY L. 173, 186 (2013). At minimum, it is undeniable that some tension exists between this rule and the core COMI principles emphasized by the Second Circuit in *Fairfield Sentry* itself—namely, the primacy given to "the regularity and ascertainability of a debtor's COMI," and the need "to ensure that a debtor has not manipulated its COMI in bad faith." 714 F.3d at 137.

Nevertheless, this tension should not be overstated. In cases involving clearly manipulative COMI shifts, a flexible application of *Fairfield Sentry*'s look-back rule may give the court sufficient tools to uphold core COMI principles. *See infra* fn. 7. In some other cases, even a late-in-the-day COMI shift may not necessarily be abusive, but instead may actually further chapter 15's objectives. In particular, if the country to which the debtor moves its COMI is its place of incorporation—and especially if the debtor previously told investors that country's laws might govern an insolvency proceeding—the debtor's new COMI may jibe with the expectations creditors had when they invested in the debtor. In a case of that sort, recognition of the debtor's chosen COMI may advance chapter 15's goals, as Chief

these facts are more than sufficient to rebut the presumption that the Debtor's COMI is in the Cayman Islands.

This leaves the question of whether the Debtor's COMI is in Hong Kong or instead in the PRC. A natural starting point is to look to the factors identified by the bankruptcy court in *SPhinX* and cited by the Second Circuit in *Fairfield Sentry* as "a helpful guide"—namely, "[i] the location of the debtor's headquarters; [ii] the location of those who actually manage the debtor . . . ; [iii] the location of the debtor's primary assets; [iv] the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; [v] and/or the jurisdiction whose law would apply to most disputes." *Fairfield Sentry* at 137 (quoting *SPhinX,* 351 B.R. at 117). The proper time frame for this inquiry is the date of the Debtor's chapter 15 filing, with a look-back to the period between the Debtor's Hong Kong and chapter 15 filings. *Id.* at 133, 137.

In this case, the *SPhinX* factors do not by themselves provide a clear answer to the COMI question. The first two factors could be construed to favor either Hong Kong or the PRC, depending on how they are interpreted; the third and fifth factors point in opposite directions, supporting the PRC and Hong Kong, respectively; and the fourth factor is entitled to little or no weight. More helpful is the guiding principle identified by the Second Circuit: "COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties." *Id.* at 130. That principle strongly supports a Hong Kong COMI finding. Finally, two additional considerations—creditor expectations and creditor support for the Hong Kong restructuring—lend further support to that conclusion. We address these points in turn below.

---

Judge Glenn explained in his *Modern Land* decision. *See Modern Land*, 641 B.R. at 786-93; *see also* Hon. Allan L. Gropper (ret.), *Recognition and Relief in Chapter 15*, ABI JOURNAL 72, 100 (2023) (advocating relaxed COMI standards: "the appropriate time to consider protection of creditors and others is not at the point of recognition," but instead when the court addresses "appropriate relief" and "sufficient protection" of affected parties under Code §§ 1521and 1522).

### A. The *SPhinX* Factors Are Inconclusive

Application of the *SPhinX* factors in this case illustrates the aptness of Judge Drain's observation that "the Court should not apply such factors mechanically" but instead should evaluate and apply each factor in light of chapter 15's policies. *SPhinX*, 351 B.R. at 117. For the first two *SPhinX* factors in particular—the location of the Debtor's headquarters and of those who manage the Debtor—this point is critical: applying these two factors mechanically yields very different results than applying them to further the "regularity and ascertainability" principle emphasized in *Fairfield Sentry.* Particularly since the other relevant *SPhinX* factors (the third and fifth) point in opposite directions, that principle is determinative here.

#### 1. The location of the Debtor's headquarters

The Debtor claims to be headquartered in Hong Kong. However, the evidence in the record and in the Debtor's public filings indicates that the Debtor has no real headquarters office of its own, but only a "mail-drop" office that it lists as its Hong Kong address:

- The Debtor has changed its official address repeatedly in recent years, and the official address has always appeared to be just a single room. *See, e.g.*, Offering Memorandum, Sunac China Holdings Limited (August 2, 2017) at 4 [https://perma.cc/B39N-QC2Q]; Offering Memorandum, Sunac China Holdings Limited (Jan. 21, 2021) at 4; Change of Principal Place of Business in Hong Kong, Sunac China Holdings Limited (November 17, 2023) at 1 [https://perma.cc/V7EF-698N].

- The offering memoranda for the Debtor's notes do not describe the Debtor's Hong Kong address as its primary place of business, but merely as its "Principal Place of Business *in Hong Kong*," with a separate address in Tianjin listed as the Debtor's "Principal Place of Business in the PRC." *See, e.g.,* Offering Memorandum, Sunac China Holdings Limited (Jan. 21, 2021) at 4 (emphasis added).

- The Debtor appears never to have hosted its board meetings or annual meetings at its official Hong Kong address, but instead to have used a variety of other Hong Kong addresses (each presumably rented for the occasion) for these

16

purposes. *See, e.g.,* Declaration of Gao Xi, *In re Sunac China Holdings Limited*, Case No. 23-11505-pb [Dkt. 4] ⁋ 7; *id.* Ex. A (Board Meeting Minutes) at 1.[5]

Thus, if this factor is interpreted to refer to a physical headquarters location, it is not helpful. The Debtor has no real headquarters office, in any traditional sense of the word. Instead, most of its executives (who are also executives of the Debtor's subsidiaries) work out of the subsidiaries' offices on the mainland, and its directors utilize Hong Kong office space on what appears to be an *ad hoc* basis to conduct their board meetings.

However, the term "headquarters" need not be construed to refer to a physical location. Instead, it can mean the location of the Debtor's head office functions—or to use the term adopted by the Supreme Court and referenced in *Fairfield Sentry*, its "'nerve center,' . . . from where the debtor's activities are directed and controlled," 714 F.3d at 138 n. 10 (quoting *Hertz Corp.*, 559 U.S. at 92-93)). In this case, where Hong Kong has always been the center of the Debtor's business activities and decision-making, it makes sense to construe the factor this way, consistent with the Second Circuit's teaching that "COMI lies where the debtor conducts its regular business." *Id.* at 130. Interpreted in this fashion, this factor weighs heavily in favor of a Hong Kong COMI, because as discussed in Part II.B below, the Debtor's business activities have always been principally carried out in and controlled from Hong Kong.

### 2. *The location of those who actually manage the Debtor*

Almost all of the Debtor's senior management—all but the CFO, Mr. Gao—live and work on mainland China. In particular, all six of the executive directors who serve on the Debtor's board,

---

[5] The testimony provided by the Debtor's witnesses concerning the location of the Debtor's headquarters was not particularly helpful. At the initial hearing on the Motion, the declaration filed as the direct testimony of the Debtor's main witness, Mr. Gao, followed the approach taken by the offering memoranda, saying merely that the Debtor has "*a principal place of business*" in Hong Kong (emphasis added). When pressed by the Court to clarify what he meant, Mr. Gao was unable to do so, which prompted the Court to request supplemental testimony. At the continued hearing on the Motion, the Debtor's new witness, Mr. Cheng, testified that the Debtor's headquarters was in Hong Kong, but like Mr. Gao, he provided no detail concerning any physical headquarters location. However, Mr. Cheng did provide significant testimony concerning the Debtor's activities in Hong Kong, as discussed in Part II.B below.

including the board chairman, the chief executive officer and the chief operating officer, live and

work in mainland China, where they are employed as executives of the Debtor's PRC-based

subsidiaries. These and other executives work at the Sunac Group's various offices on the

mainland, including its headquarters in Tianjin and its regional executive offices in Beijing,

Shanghai and Guangdong. Similarly, most members of the Debtor's board of directors—all six

executive directors, plus one of the four independent directors—are based on mainland China.

Only the three other independent directors are based in Hong Kong. Thus, a mechanical application

of this factor could support a finding that the Debtor's COMI is in the PRC, not in Hong Kong.

However, if instead of asking where these executives and directors spend most of their

time, one asks where they act or make decisions *on the Debtor's behalf*, this factor supports the

opposite conclusion. This approach, like interpreting "headquarters" to refer to the locus of the

Debtor's decision-making rather than to a physical location, jibes with the principle that "COMI

lies where the debtor conducts its regular business." *Id.* at 130. And as discussed in Part II.B below,

Hong Kong has always been the locus of the Debtor's activities and decision-making.

### 3. The location of the Debtor's primary assets

The Debtor's main assets are intangibles—principally, amounts due from subsidiaries and

investments in subsidiaries, totaling US$8.3 billion and US$3.5 billion, respectively, as of

December 31, 2022. It has long been recognized that the location of intangible assets is highly

context specific. "[A]s Judge Cardozo observed, determination of [an intangible asset's] situs for

one purpose has no necessary bearing on its determination for another purpose," but rather depends

on "considerations of 'justice and convenience in particular conditions.'" *Bankers Trust Co. v.

Equitable Life Assur. Soc.*, 19 N.Y.2d 552, 556-57 (1967) (quoting *Severnoe Sec. Corp. v. London

& Lancashire Ins. Co.*, 255 N.Y. 120, 123-24, 174 N.E. 299 (1931) (Cardozo, C.J.)).

In the COMI context, as Judge Drain has pointed out, a court's consideration of the location of assets should be guided by "[p]ragmatic considerations affecting the Debtors' cases," such as which countries' courts are likely to be involved in liquidating or administering the debtor's assets. *SPhinX*, 351 B.R. at 119 (holding that location of most assets in U.S. supported U.S. COMI finding, since debtors' liquidators would need U.S. courts' assistance to realize on those assets). In this case, the judicial assistance the Debtor may need is not help in liquidating its assets, but instead cooperation in shielding its assets from creditor enforcement actions, such as attempts to domesticate a foreign money judgment and to execute on the Debtor's assets. Thus, to determine the "location" of particular assets, one should ask: In which countries will creditors need judicial assistance to enforce a judgment against those assets?

The answer to this question, which the Debtor has not briefed, is not entirely clear. Nevertheless, it is difficult to see how judgment creditors of the Debtor could enforce their judgments against the amounts owed by the Debtor's subsidiaries—the Debtor's most valuable assets, according to its books—without assistance from the PRC courts. To attach the amounts the subsidiaries owe the Debtor, creditors presumably would need to bring a garnishment action, or its PRC equivalent, against the subsidiaries. *See generally* Charles J. Tabb, LAW OF BANKRUPTCY § 1.3(d) (5th ed. 2020) (reviewing post-judgment garnishment procedures under U.S. law). Such an action presumably would need to be brought in the PRC, since that is where most of the subsidiaries are both located and incorporated. Indeed, the record contains no indication that the subsidiaries transact any business outside of the PRC. Thus, from a COMI perspective, it appears

that the Debtor's most valuable assets should be deemed located in the PRC, weighing in favor of a PRC COMI finding.[6]

### 4. *The location of the majority of the Debtor's creditors*

This factor is entitled to little, if any, weight, because as far as can be told from the record, most creditors are based neither on mainland China nor in Hong Kong, but instead in multiple other jurisdictions around the world. While the record indicates that fewer than 10% of the Debtor's creditors are based on mainland China, it does not show what percentage are based in Hong Kong. Presumably, the latter percentage falls far short of a majority, since the only evidence presented by the Debtor on this point is that almost 50% of its creditors (and more than 60% of those that signed on to the RSA) are *registered* to do business in Hong Kong. However, registration is required of all companies that wish to conduct any business in Hong Kong. *See* Business Registration Ordinance, (2022) Cap. 310, § 2(1A) (H.K.). Thus, the record tells us nothing about the nationality or principal location of these creditors. This factor therefore has little or no bearing on a determination of the Debtor's COMI.

### 5. *The jurisdiction whose law would apply to most disputes*

The debt subject to the Hong Kong Scheme—the $9 billion of Existing Debt—is governed by the laws of multiple jurisdictions. About $8 billion of the Existing Debt is governed by New York law, about $1 billion is governed by Hong Kong law, $29 million is governed by U.K. law, and none of this debt is governed by PRC law.

Although the Hong Kong-governed debt makes up a relatively small portion of the debt being restructured, it has an outsized significance. Notably, Hong Kong follows the so-called

---

[6] The location of the Debtor's other main assets, the equity of its subsidiaries, is less clear. Without briefing of this issue, the Court cannot tell whether a judgment creditor of the Debtor would need the assistance of the Hong Kong courts, the PRC courts or both to execute its judgment against these equity interests.

"*Gibbs* rule," under which debt governed by Hong Kong law can only be restructured in Hong Kong. *See Re Rare Earth Magnesium Technology Group Holdings Limited*, [2022] HKCFI 1686, at ¶ 29 [https://perma.cc/WYL2-GL4W]; *Re China Lumena New Materials Corp*, [2020] HKCFI 388, at ¶ 10 [https://perma.cc/H3UE-EKQ4]. Consequently, had the Debtor chosen to file its restructuring case outside of Hong Kong, it would have had to file a parallel proceeding in Hong Kong to avoid the risk that creditors holding Hong Kong law-governed debt might sue in Hong Kong to enforce that debt, and a Hong Kong court might decline to recognize and enforce the foreign court's discharge of that debt. This factor therefore weighs in favor of a Hong Kong COMI.

## B.  The Debtor's Business Activities Were Regularly Carried Out and Approved in Hong Kong

More helpful than a mechanical tallying up the *SPhinX* factors is an approach that focuses on the location of the Debtor's business activities and decision-making. Such an approach is consistent with the Second Circuit's baseline COMI principle: "that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties." *Fairfield Sentry*, 714 F.3d at 130; *see also id.* at 138 n. 10 (court may "consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI") (quoting *Hertz Corp.*, 559 U.S. at 92-93).

Under this approach, there is little question that Hong Kong is the Debtor's COMI. At the time the chapter 15 petition was filed—and, indeed, throughout the Debtor's existence—Hong Kong was the primary place where the Debtor carried out its business activities and where its board of directors approved its major decisions. This Hong Kong locus was known, or at least readily ascertainable, by the Debtor's creditors.

For the past year and a half—since June 2022, a full nine months before it commenced its Hong Kong restructuring case—the Debtor's primary business activity has been the restructuring

of its debts. Indeed, as a holding company with little business other than to raise capital, it had few activities during this period other than debt restructuring. Its restructuring efforts were led by its CFO, Mr. Gao, who lives and works in Hong Kong. Mr. Gao carried out these efforts primarily in Hong Kong, through a series of nine meetings with an *ad hoc* committee of the Debtor's principal creditors. While a number of these meetings occurred "virtually," all of the in-person meetings took place in Hong Kong, where most of the professional advisors for both the Debtor and the *ad hoc* committee were based.

Board approval of the Debtor's restructuring occurred either in Hong Kong or virtually. The most significant of the board meetings approving the restructuring—the March 12, 2023, board meeting to approve the RSA—was held in-person in Hong Kong. The remaining board approvals were given virtually, either at virtual meetings or by written consents. No board meeting relating to the restructuring was held in-person on mainland China.

Thus, it is clear that Hong Kong was the center of the Debtor's business activities and decision-making during the entire period identified as relevant by the Second Circuit—both when it filed this chapter 15 case and during the time between its Hong Kong and chapter 15 filings. And the Hong Kong locus of the Debtor's restructuring activities was well known by the Debtor's principal creditors, whose representatives attended the restructuring meetings.

Finally, it bears note that Hong Kong was the center of the Debtor's business activities not only when it filed its Hong Kong restructuring case, but before that time as well—indeed, throughout its entire existence—and thus, there can be no question of the Debtor having "shifted" its COMI in bad faith by choosing Hong Kong as the locus of its restructuring.[7] Since its formation

---

[7] Had the Debtor's center of operations instead been on mainland China up to the time it filed its Hong Kong restructuring case, that might have raised a question whether the choice of a Hong Kong restructuring forum constituted a bad faith "shift," or "manipulation," of its COMI. That specific issue was not before the Second Circuit

in 2007, the Debtor's main business activity has been to raise capital in the international financial markets. It conducted that activity primarily in Hong Kong, where Mr. Gao (whom the board authorized to negotiate, finalize and execute the Debtor's debt issuances) led most investor calls, roadshows, and other meetings with investors and arrangers. Most meetings of the Debtor's board of directors were held in Hong Kong from 2010 through 2019 (after which they were conducted virtually due to the COVID-19 pandemic), and most of the financial institutions with which Debtor partnered to issue the Existing Debt are based in Hong Kong. In addition, the Debtor's shares were listed on the Hong Kong Stock Exchange, and as a result, the Debtor was subject to oversight and regulation by the Hong Kong Securities and Futures Commission.

### C.  Creditor Expectations Further Support a Hong Kong COMI

The Second Circuit's focus on "regularity and ascertainability"—specifically, "that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties," *Fairfield Sentry*, 714 F.3d at 130—suggests that the creditor expectations that matter most are those that flow from the "ascertainable" location of the debtor's business activities. At the same time, courts have given weight to creditor expectations of other sorts, particularly those created by statements in the debtor's public filings. *See, e.g., In re Oi Brasil Holdings Coöperatief U.A.*, 578

---

in *Fairfield Sentry*, because the joint liquidators there had shifted the debtors' remaining wind-down activities to the British Virgin Islands seven months before commencing their BVI liquidation case, *see* 714 F.3d at 138-39, and the court of appeals saw no reason to disturb the bankruptcy court's finding that no improper manipulation was involved, *id.* at 139. Thus, the Second Circuit's ruling that the permitted look-back period starts at the time the debtor commenced its foreign insolvency proceeding does not necessarily preclude a determination that, at the outset of the look-back period, the debtor improperly manipulated its COMI by selecting a forum with which it had no prior connections.

Arguably, such a determination would stretch the Second Circuit's definition of the permitted look-back period as "the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition," 714 F.3d at 137; *see also id.* at 138 (rejecting appellant's contention "that a debtor's entire operational history should be considered"). However, a flexible interpretation of the look-back period may be warranted, both because this precise issue was not before the court of appeals and because, in a case of real manipulation, a contrary reading would do violence to the very COMI principles the court itself emphasized—namely, the primacy given to "the regularity and ascertainability of a debtor's COMI," and the need "to ensure that a debtor has not manipulated its COMI in bad faith," *id.* at 137.

B.R. 169, 228-30 (Bankr. S.D.N.Y. 2017) (assessing "creditor understanding of the nature and risks of their investments" in light of indentures' terms and offering memoranda disclosures); *see also In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 274 (Bankr. S.D.N.Y. 2019) (collecting additional COMI case law to the same effect); *Modern Land,* 641 B.R. at 787-89 (giving particular weight to statements in offering memoranda that debtor was incorporated in the Cayman Islands and that an insolvency proceeding would likely involve Cayman Islands law).

Here, the Debtor's offering memoranda and other public filings gave creditors little reason to expect that a restructuring, if eventually needed, would occur in Hong Kong or be subject to Hong Kong law. The Debtor's public filings made clear that the Existing Debt is governed predominantly by New York law. Moreover, while the filings noted that about $1 billion of the $9 billion of Existing Debt was governed by Hong Kong law, they made no mention of Hong Kong as either a potential restructuring forum or as the jurisdiction whose laws would govern a restructuring. Rather, the offering memoranda referenced the Debtor's Cayman Islands incorporation and said that Cayman Islands law would most likely apply in a restructuring. Thus, it appears that creditors had much more reason to expect a restructuring in the Cayman Islands than in Hong Kong.

More important, however, is that creditors had even less reason to expect a restructuring in the PRC. As the Debtor's offering memoranda and other public filings disclosed, (i) the Debtor's borrowings were governed by the laws of multiple jurisdictions (New York, Hong Kong and the United Kingdom), but not by PRC law; and (ii) similarly, the Debtor and the subsidiaries that guaranteed its borrowings were incorporated in multiple jurisdictions (the Cayman Islands, the British Virgin Islands and Hong Kong), but not in the PRC. The reason for this was apparent: According to the offering memoranda, PRC law involved multiple risks not posed by the laws of

the other relevant jurisdictions, including not only the uncertainty caused by the undeveloped nature of PRC laws and regulations, but also the potential for arbitrary legal rulings based on unpublished government policies or rules. *See id.* at 42.[8]

In light of these disclosures, it was reasonable for creditors to expect that the Debtor would not choose to restructure in the PRC. Given that the COMI choice in this case is not between Hong Kong and the Cayman Islands but instead between Hong Kong and the PRC, this expectation weighs in favor of a Hong Kong COMI.[9]

### D. Creditors' Overwhelming Approval of the Scheme, Coupled With the Absence of Objections, Provides Further Support for a Hong Kong COMI

As a number of courts in this District have emphasized, creditor support for a restructuring can be entitled to significant weight, particularly if no creditor objects to the debtor's choice of restructuring forum. As Judge Drain explained in *SPhinX*, chapter 15 is designed to maximize the courts' flexibility to further the chapter's overarching goals, including "to protect the interests of the parties in interest pursuant to fair and efficient procedures that maximize value." *SPhinX,* 351 B.R. at 112-14. Judge Drain continued:

---

[8] The full quotation is as follows:

> [B]ecause [PRC] laws and regulations have not been fully developed, and because of the limited volume of published cases and the non-binding nature of prior court decisions, the interpretation of PRC laws and regulations involves uncertainty. Depending on the way an application or case is presented to a government agent and on the government agent itself, we may receive less favorable interpretations of laws and regulations than our competitors. In addition, the PRC legal system is based in part on government policies and internal rules (some of which are not published on a timely basis or at all) that may have a retroactive effect. As a result, we may not be aware of our violation of these policies and rules until some time after the violation.

*Id.*

[9] While secondary, the fact that the restructuring laws of Hong Kong share certain similarities with those of the Cayman Islands lends further support to this conclusion. As former members of the British Commonwealth, both Hong Kong and the Cayman Islands have inherited Great Britain's common law traditions. In addition, both have enacted restructuring statutes that permit schemes of arrangement, subject to broadly similar rules. *See* Jonathon Milne and Alex Davies, *Schemes of Arrangement: Restructuring in the Cayman Islands*, AM. BAR ASS'N (Oct. 26, 2023), available at https://www.americanbar.org/groups/business_law/resources/business-law-today/2023-november/ [https://perma.cc/DD45-2YW3].

> Because their money is ultimately at stake, one generally should defer, therefore, to the creditors' acquiescence in or support of a proposed COMI. It is reasonable to assume that the debtor and its creditors . . . can, absent an improper purpose, best determine how to maximize the efficiency of a liquidation or reorganization and, ultimately, the value of the debtor . . ..

*Id.* at 117. More recently, Chief Judge Glenn gave substantial weight to concerns of this sort in his *Modern Land* decision, holding that "overwhelming creditor support," coupled with "definitive creditor expectations" and the lack of any COMI objections, "solidif[ied] a finding of COMI in the Cayman Islands." 641 B.R. at 789.

Of course, creditor support for a debtor's choice of forum only goes so far. It cannot override a valid COMI objection. *See SPhinX*, 351 B.R. at 121 (declining to recognize chosen forum despite overwhelming investor support, given creditor's objection that the choice of forum furthered improper tactical goals). And even in the absence of objections, the bankruptcy court still has the duty to make its own COMI determination. *See Modern Land*, 641 B.R. at 782; *Alpha Fund*, 381 B.R. at 51–54; *Bear Stearns*, 374 B.R. at 129. Nevertheless, in many cases where no creditors object, deference to the forum chosen by the debtor and supported by its creditors is warranted, as it furthers chapter 15's stated goals—including "maximizing the value of the debtor's assets" and "promot[ing] cooperation between the American and [foreign] courts, by helping facilitate the [foreign proceeding] and maximizing the chances of a successful reorganization," *Modern Land*, 641 B.R. at 787—without impairing any party's interests.

These considerations are entitled to significant weight here. Creditors have overwhelmingly voted to approve the Debtor's Scheme. No-one has objected to the Debtor's motion to recognize the Hong Kong case as a foreign main proceeding, nor is there any indication that the Debtor chose that forum for any improper purpose. To the contrary, the Debtor had sound reasons to restructure in Hong Kong, and recognition of its Hong Kong forum choice will further

key objectives of chapter 15, including cooperation with the Hong Kong court, facilitation of the

Debtor's reorganization, and maximization of the value of the Debtor's assets.

<u>**CONCLUSION**</u>

The Debtor's COMI was in Hong Kong at the time of its chapter 15 petition, and at all

relevant prior times. For this reason, as well as the additional reasons discussed in the Court's

bench ruling, the Debtor is entitled to recognition of the Hong Kong proceeding as a foreign main

proceeding, to enforcement of the Hong Kong Scheme, and to the related relief it has requested.


Date: January 30, 2024
New York, New York

/s/ Philip Bentley
**Hon. Philip Bentley**
**United States Bankruptcy Judge**